**WIRTHMORE FEEDS, INC., et al.,**
Plaintiffs,

v.

The **BALTIMORE AND OHIO RAILROAD COMPANY et al.,**
Defendants.

**WIRTHMORE FEEDS, INC., et al.,**
Plaintiffs,

v.

**CHESAPEAKE & OHIO RAILWAY COMPANY et al., Defendants.**
Civ. Nos. 10289, 10294.

United States District Court
W. D. New York.

July 26, 1961.

Rice, Carpenter & Carraway, Washington, D. C. (Leo J. Fallon, Buffalo, N. Y., of counsel), for plaintiffs.

Eugene E. Hunt, New Haven, Conn. (John E. Leach, Buffalo, N. Y., of counsel), for defendants.

HENDERSON, District Judge.

The plaintiffs, feed manufacturers and an association of such manufacturers, seek an injunction enforcing Interstate Commerce Commission orders entered in Fourth Section applications numbered 37837 and 37892 on August 15, 1962 and September 19, 1962, respectively.

The rates in issue were published with the I.C.C. by the defendants and by their connecting railroad carriers, including the New York, New Haven & Hartford Railroad Company and the Maine Central Railroad Company, to main destinations on or about July 15, 1962, and to the connecting destination on or about August 19, 1962. Following assertions by the plaintiffs and others that the rates would result in unlawful discrimination

and preference in violation of sections 2 and 3 of the Interstate Commerce Act, the Commission, by its Board of Suspension, suspended the rates pursuant to its authority under section 15(7) of the Act. Upon expiration of the maximum period of suspension, the defendants voluntarily suspended the effectiveness of the rates until May 1, 1963. Insofar as the proceedings under section 15 are concerned, it is clear that the court lacks jurisdiction to further suspend these rates. Arrow Transp. Co. v. Southern Ry., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed. 2d 52 (1963).

■ However, because the proposed tariffs had the effect of charging less for a longer than for a shorter haul, the defendants filed applications seeking relief from the prohibition contained in section 4 of the Act which state in part:

"It shall be unlawful for any common carrier subject to this chapter * * * to charge or receive any greater compensation in the aggregate for the transportation * * * of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this chapter * * *, but this shall not be construed as authorizing any common carrier within the terms of this chapter * * * to charge or receive as great a compensation for a shorter as for a longer distance: *Provided,* That upon application to the Commission and after investigation, such carrier, in special cases, may be authorized by the Commission to charge less for longer than for shorter distances for the transportation of * * * property, and the Commission may from time to time prescribe the extent to which such designated carriers may be relieved from the operation of the foregoing provisions of this section,

but in exercising the authority conferred upon it in this proviso, the Commission shall not permit the establishment of any charge to or from the more distant point that is not reasonably compensatory for the service performed; and no such authorization shall be granted on account of merely potential water competition not actually in existence * * *."

To date this relief has not been granted although interim orders denying such relief are in effect.

The defendants argue, however, that this case, involving a section 4 departure, cannot be distinguished from that presented in the Arrow case, supra, which involved section 15(7) of the Act. The opinion of the Fifth Circuit Court of Appeals in the Arrow case succinctly describes the more ordinary procedure involved in effectuating those tariffs as follows:

"The Congress, in its wisdom, has permitted carriers to initiate their own schedule of rates subject to the authority of the Interstate Commerce Commission to determine the lawfulness of such rates. Pending the Commission's hearing for such purpose, it may suspend the operation of the rate schedule 'but not for a longer period than seven months beyond the time when it would otherwise go into effect.' 49 U.S.C.A. § 15(7). Some irreparable injury appears unavoidable in the process of establishing new rates. If the new rates are ultimately determined to be just, reasonable, and lawful, the carriers and that portion of the public which would benefit from the change in rates have nevertheless suffered irreparable injury during the period of suspension. If the period of suspension has expired and the new rate schedule goes into effect, but is subsequently determined to be unlawful, then competing carriers and that portion of the public which would suffer because of the change in rates

has been injured during the period when the rates were not suspended, and in many cases that injury is irreparable." [1]

In this context reference to the history of section 4 is enlightening.

In the Act to Regulate Commerce of 1887 (Feb. 4, 1887, c. 104, pt. I, § 4, 24 stat. 380), section 4 conferred upon carriers the power of "primary judgment." That is, the carriers determined initially whether in the phraseology of the statute "substantially similar circumstances and conditions" existed which would bring a tariff involving a long-and-short-haul problem within the statute's prohibition. Had section 4 retained this form, tariffs possibly within its ambit, as were the tariffs in the Arrow case, supra, would be self-executing. However, by amendment to section 4 in 1910 (June 18, 1910, c. 309, § 8, 36 stat. 547), Congress deleted the "substantially similar circumstances and conditions" clause, took the power of "primary judgment" from the carriers, and reposed this power in the Commission. Thus, the prohibition became absolute, with relief available only after Commission findings that a "special case" existed and that the tariff was "reasonably compensatory." [2] Intermountain Rate Cases, 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408 (1914); United States v. Louisville & N. R. R., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245 (1914); Skinner & Eddy Corp. v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1918). In fact, to obviate the necessity of immediate change of all non-conforming existing rates, the 1910 amendment included a proviso (since deleted) which permitted the continuance of such rates pending I.C.C. determinations under section 4. [3]

The legislative history of a more recent amendment to section 4 [4] (July 11, 1957, Pub.L. 85–99, 71 stat. 292), which made this section self-operating with respect to departures in connection with rates over circuitous routes, provides additional evidence of the basic difference between this and other sections of the Act. The discussion contained in House Report No. 577 which accompanied S. 937 (which embodied the amendment) states in part:

"The long-and-short-haul clause of the Act has been surrounded throughout its history by more controversy than any other provision. A major portion of the congressional debate at the time the original Act was under consideration in 1887 was devoted to this clause. In the 10 years that followed, a series of court decisions rendered it ineffectual by interpreting the statute as it was then worded as permitting the carriers to determine for themselves whether the long-and-short-haul departures were unlawful. The dissatisfaction with this situation led to the amendments in 1910 and 1920, by which the clause was strengthened, *and the Commission was given the primary function of determining whether departures should be sanctioned.*" [Emphasis added.]

Further, the comments of the then Secretary of Commerce, Sinclair Weeks (which are included in the House Report), specifically favored more extensive legislation which, while retaining the long-and-short-haul provision, would provide that " * * * rail and water common carriers could establish departure rates without prior approval of the Interstate Commerce Commission * * " under certain conditions. To date such legislation has not been enacted.

The court concludes, therefore, that the tariffs in question, involving section 4 departures, are not self-executing but, for their effectiveness, are dependent upon prior I.C.C. approval. Pending such approval, under the terms of the section, they must be viewed as unlawful. Sub-

---

1. Arrow Transportation Co. v. Southern Ry., 308 F.2d 181, 184 (5th Cir. 1962).

2. See: Sichel, The Interstate Commerce Commission and the Long-and-Short-Haul Problem, 45 Yale L.J. 1426 (1936).

3. See: Historical Note, 49 U.S.C.A. § 4 (1).

4. 1957, U.S.Code Cong. and Admin.News, pp. 1301–1306.

ject to Commission approval or termination of Fourth Section objection by reduction of intermediate rates, the plaintiffs' motion is granted.

So ordered.